UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | No. 2:21CR022 |
| ) | |
| TRAVIS MCMICHAEL, ) | |
| ) | |
| Defendant. ) | |

## SENTENCING MEMORANDUM

Travis McMichael files this sentencing memorandum for the Court's consideration. Having tried this case and reviewed the Presentence Investigation Report, the Court is well-aware of the evidence adduced at trial and the information contained in the PSI. McMichael files this sentencing memorandum to addresses issues of his safety while incarcerated.

This case has generated national attention and very strong feelings against these defendants. McMichael discussed some of the public outrage in his motion regarding venue. (Doc 90) His arrest generated comments on social media calling for "2 more bullets," electrocution, immediate death sentences, rotting in hell, public hangings, and televised executions. (Doc 90-Pgs 3-4) Jury selection took

1

a week in this case, with some venirepersons expressing strong opinions about these defendants.

McMichael has been held in solitary confinement at the Glynn County Detention Center since his state arrest in May 2020. The federal grand jury returned its indictment on April 28, 2021. The state trial, held in the Superior Court of Glynn County and televised, ended with the jury's verdict on November 24, 2021. The President of the United States issued a public statement about that verdict.[1] After the federal verdict in February 2022, the Attorney General made a statement, and the Vice-President issued a tweet.[2]

McMichael has received threats. Hundreds of threats. He quit counting in January 2022, at around 800 threats. The threats have included statements that his image has been circulated through the state prison system on contraband cell phones, that people are "waiting for him," that he should not go into the yard, and that correctional officers have promised a willingness (whether for pay or for free) to keep

---

[1] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/24/statement-from-president-joe-biden/

[2] *See* https://www.washingtonpost.com/national-security/2022/02/22/arbery-verdict-hate-crimes/

certain doors unlocked and backs turned to allow inmates to harm him. Undersigned counsel has raised these concerns with the Georgia Department of Corrections ("DOC"), which has replied that these threats are unverified and that it can securely house McMichael in state custody.

Despite the DOC's response, these threats bear indicia of reliability. Cell phones are a problem in state prisons, as a recent case before this Court demonstrated. *See United States v. McMillan et al.*, CR520-007 at Doc 3-2, Pg 6 (S.D. Ga. May 20, 2020)(alleging in indictment that drug conspiracy used "correctional officers to coordinate drug shipments and to distribute drugs and cell phones in Georgia correctional facilities"). In November 2021, an Atlanta news station reported on conditions at the now-closed Georgia State Prison, where inmates could "unlock their cell doors at will and where drugs, phones and weapons are everywhere."[3] A supervising correctional officer recently pleaded guilty to an indictment alleging that he turned a blind eye as correctional officers assaulted an inmate. *See* Exhibit A.

---

[3] *See* https://www.wsbtv.com/news/local/atlanta/inmates-fear-safety-after-cell-phone-video-shows-shocking-conditions-inside-ga-prisons/ZIEHOC3RNVFCBF475PVHE3M6BA/

But perhaps the most compelling factor is an ongoing investigation into the conditions at Georgia prisons. On September 14, 2021, the Department of Justice Civil Rights Division – the same division that brought this federal prosecution (Doc 1- Pg 8) – announced an investigation into conditions in Georgia prisons. *See* Exhibit B.[4] The purpose of the federal investigation is to "examine whether Georgia provides prisoners reasonable protection from physical harm at the hands of other prisoners." *Id*. The investigation recognizes that division's "top priority" commitment to "[e]nsuring the inherent human dignity and worth of everyone, including people who are incarcerated inside our nation's jails and prisons." *Id*.

As part of its investigation, the government filed on March 28, 2022, a petition to enforce compliance with a subpoena in the United States District Court for the Northern District of Georgia. *See* Exhibit C. That motion acknowledges the constitutional, statutory, and case law duties of prisons to protect inmates from substantial risk of harm. *Id*. at 1-3, 17-18. It explains that the investigation began in 2016; it initially

---

[4] *See* https://www.justice.gov/opa/pr/justice-department-announces-investigation-conditions-georgia-prisons

focused on the rights of LGBTI prisoners, and then expanded to examine whether the DOC "fails to protect prisoners housed at close- and medium-security levels from harm due to prisoner-on-prisoner violence." *Id.* at 4-5. In response to a September 24, 2021, request for documents, the DOC "provided access to only an incomplete set of policies (only a fraction of those requested have been provided), some blank form documents, a few organizational charts, and other documentation related to [DOC] facilities." *Id.* at 5-6. Significantly, the DOC "provided access to no incident reports, documents or data related to homicides or acts of violence. . . ." *Id.* at 6. Due to the incomplete production and other issues, the government elected to serve a subpoena on the DOC Commissioner on December 14, 2021. *Id.* at 15. A month later, the DOC responded by sending no additional responsive documents – just objections and "several purported bases for refusing to comply." *Id.* at 16.[5]

---

[5] At the present time, the petition has not been finally resolved. The magistrate judge's report and recommendation, attached to this memorandum as Exhibit D, recommends granting the government's request almost in whole cloth.

News media attempted to calculate the deaths in Georgia state prisons. Georgia Public Broadcasting's analysis showed 53 homicides in Georgia state prisons between 2020 and 2021. *See* Exhibit E.[6] The *Atlanta Journal Constitution* later counted 57 murders in DOC facilities during this time period, which is "almost triple the total of 21 for 2018 and 2019." *See* Exhibit F. In April 2022, GPB reported that there have been 106 deaths dating back to 2017, with no cause of death reported, and a record number of prison homicides in the past three years.

No doubt that the state first arrested and sentenced McMichael. His concern is that he will promptly be killed upon delivery to the state prison system for service of that sentence: He has received numerous threats of death that are credible in light of all circumstances, and the government has a pending investigation into the Georgia DOC's ability to keep inmates safe in a system where murder rates have tripled. There are several statutory sentencing purposes. *See* 18 U.S.C. §3553(a). Retribution and revenge are not among them, no matter how unpopular the defendant.

---

[6] *See* https://www.gpb.org/news/2022/04/05/federal-investigators-are-asking-the-court-force-transparency-on-georgia-prisons

There is a Georgia statutory mechanism, the Interstate Corrections Compact, which would permit the state to ask the Bureau of Prisons to take custody of a prisoner for service of a state sentence. *See* O.C.G.A. §42-11-2, Article III. The state has told counsel that it does not intend to do that. It is counsel's understanding that the government is not going to make a request to the state for McMichael to serve his sentence in federal custody, either.[7]

In an unopposed motion, the government asked the Court to amend previously issued writs to comply with the Interstate Agreement on Detainers ("IAD"); specifically, the motion asked for an order that the three defendants to "remain in federal custody until the completion of all federal proceedings related to this case." (Doc 132-Pg 1) The

---

[7] Derek Chauvin was the Minneapolis police officer who choked George Floyd to death. A Minnesota state judge sentenced Chauvin to 22 ½ years in prison in June 2021. https://www.npr.org/sections/trial-over-killing-of-george-floyd/2021/06/25/1009524284/derek-chauvin-sentencing-george-floyd-murder

On July 7, 2022, Chauvin received a 252-month (or 21-year) sentence in federal court. *See* https://www.justice.gov/opa/pr/former-minneapolis-police-officer-derek-chauvin-sentenced-more-20-years-prison-depriving His plea agreement allowed him to serve his state and federal sentences in federal custody. *See* https://abcnews.go.com/US/wireStory/chauvin-faces-future-federal-prison-floyds-death-86329393

motion noted correctly that the IAD's anti-shuttling provision seeks to minimize disruption in the rehabilitative programs offered by the sending state – here, Georgia. (*Id.* at 2) The government's motion reiterated a request for the defendants to "remain in federal custody until after the federal trial and any post-trial proceedings have been resolved." (Doc 132-Pg 3) The Court's order provided that "upon their transfer to federal custody, Defendants shall remain in federal custody through the completion of the federal trial and any post-trial proceedings." (Doc 134)

    The IAD does not use the term "post-trial proceedings." *See* 18 U.S.C. App. 2 §2, Art. IV(e) (requiring dismissal of indictment only if "*trial*" is not had in violation of the anti-shuttling provisions). At least one court has held that "trial" includes "sentencing." *Tinghitella v. California*, 718 F.2d 308, 311 (9th Cir. 1983). *Tinghitella* observed that "[t]rial" in the speedy trial clause of the Sixth Amendment has been construed to include sentencing. *Id.* It relied, too, on the fact that the "central policy foundations of the IAD support a broad construction of the term 'trial,' [and . . . ] the IAD itself provides that it '*shall* be

8

liberally construed so as to effectuate its purposes." *Id*. (emphasis in original) Here is *Tinghitella*'s explanation:

> The IAD avers that the party states have concluded that outstanding detainers based on untried indictments "produce uncertainties which obstruct programs of prisoner treatment and rehabilitation" and that the central purpose of the agreement is "to encourage the expeditious and orderly disposition of such charges." IAD, art. I. Early resolution of detainers was thought to enhance rehabilitation and to ensure fair treatment of all prisoners, since prior to the IAD, a prisoner with a detainer pending against him was often prevented from focusing on a post-imprisonment return to society or received less favorable treatment than others.
>
> Both the rehabilitative and fair treatment purposes of the IAD would be better effectuated by construing trial to include sentencing. A prisoner with foreknowledge of a time certain for imprisonment in the receiving state (here, California) presumably will more easily undergo rehabilitation than one with knowledge merely of the range of possible sentences. Moreover, treatment of prisoners in the sending state (Texas), including eligibility for "trusty" status and for work-furlough and weekend-furlough, apparently depends on the period of sentence eventually to be served in the receiving state (California).
>
> The facts of this case demonstrate another reason why the IAD should be construed to apply to sentencing. The petitioner cannot appeal from his California conviction until he has been sentenced. A reversal of that conviction on appeal would significantly affect petitioner's rehabilitation in Texas.

*Id*. at 311 & n. 5; *see also Carchman v. Nash*, 473 U.S. 716, 743 (1985)(Brennan, J., dissenting)(observing that the term "trial" is

9

"plainly used" in the IAD to "represent the broader concept of final disposition – indeed Article III uses the terms interchangeably").

Counsel admittedly cannot find any case discussing whether "trial" extends beyond "sentencing" to other "post-trial proceedings," a term that suggests direct appeal and beyond. *Cf. United States v. Davis*, 2017 WL 9398640 at *3 & n. 5 (M.D. Fla. 2017)(using the term "post-trial" to refer to two separate appeals in the defendant's criminal case and his *pro se* efforts). But the goals of the IAD, the terms of Article V, and the circumstances of this case warrant a broad construction.

"The principal goals of Congress in enacting the IAD were to facilitate the appropriate sentencing of the defendant and to enhance the possibilities of his rehabilitation by causing the prompt resolution of outstanding charges against him." *United States v. Lawson*, 736 F.2d 835 (2d Cir. 1984). Here, McMichael was sentenced on state charges on January 7, 2022, and the Court entered its order on January 19, 2022. (Doc 134) For over two years, McMichael has never left the physical custody of the Glynn County Detention Center, and the state has never begun any rehabilitative efforts. Article V(d) of the IAD allows for temporary custody to "permit[] prosecution on the charge or charges

10

contained in . . . [the] untried indictment," with return to the sending state (i.e., Georgia) contemplated "[a]t the earliest practicable time consonant with the purposes of this agreement." 18 U.S.C. App. 2, §2 Art. V(d), (e). The IAD is to be liberally construed to effectuate its purposes. *Id.* at Art. IX; *see also Cuyler v. Adams*, 449 U.S. 433, 449 (1981)(noting that "a primary purpose of the [IAD] is to protect prisoners against whom detainers are outstanding").

    The purpose of the IAD is to further programs of "prisoner treatment and rehabilitation." "Prisoner treatment and rehabilitation" presuppose that that prisoner remains alive. Due to the multiple threats against McMichael and the government's investigation into the violence in Georgia state prisons, McMichael should remain in the physical custody of the federal government ideally through the term of his concurrent federal sentence, but at the very least through all "post-trial proceedings," which should encompass at least direct appeal and

exhaustion of cert. rights in the Supreme Court of the United States.

Respectfully submitted this 4th day of August, 2022.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Defendant

Rouse + Copeland, LLC
602 Montgomery Street
Savannah, Georgia 31401
(912) 807-5000
(912) 335-3440 (fax)
ALC@roco.pro

## CERTIFICATE OF SERVICE

I have filed a copy of this sentencing memorandum and attached exhibits on the Court's CM/ECF portal, which then sends a notice of electronic filing with a link to a file-stamped .pdf copy of this filing.

This 4th day of August, 2022.

                                           /s/ Amy Lee Copeland
                                           Amy Lee Copeland
                                           Georgia Bar No. 186730
                                           Attorney for Defendant

Rouse + Copeland, LLC
602 Montgomery Street
Savannah, Georgia 31401
(912) 807-5000
(912) 335-3440 (fax)
ALC@roco.pro